THE STATE OF OHIO, APPELLEE, *v.* SWIGER, APPELLANT.
THE STATE OF OHIO, APPELLEE, *v.* BELLAMY, APPELLANT.
THE STATE OF OHIO, APPELLEE, *v.* MILLER, APPELLANT.

[Cite as State v. Swiger, 5 Ohio St. 2d 151.]

(Nos. 39072, 39088 and 39490—Decided February 16, 1966.)

154

*Mr. Melvin G. Rueger,* prosecuting attorney, for appellee.
*Mr. Albert A. Rogoff, Mr. Robert L. Davis, Mr. Loyal S. Martin, Mr. Joseph F. Weinle, Mr. Frank J. Longano* and *Mr. Flach Douglas,* for appellants.

MATTHIAS, J. The defendants herein have made three joint contentions. They shall be considered in the following order:

(1) The trauma of May 5, 1963, was not the direct and proximate cause of the victim's death.

(2) The state of Ohio did not prove beyond a reasonable doubt that the defendants had a purpose or intent to kill deceased.

(3) The defendants were denied their constitutional rights, specifically, the right to counsel and the right to confront the witnesses against them.

In addition the defendants have made separate contentions, considered in the following order:

(4) Defendant Miller argues that the trial court committed error in overruling his motion for a change of venue on the grounds of adverse publicity.

(5) Defendant Swiger argues that prejudicial error was committed when the prosecutor asked him whether he had raped deceased.

(6) Defendants Swiger and Bellamy contend that error was committed when the trial court allowed the state to use expert medical testimony in rebuttal.

Defendants contend that the trauma administered to deceased on the night of May 5, 1963, was not the proximate cause of death. The state cannot, and does not, take issue with the proposition that a necessary element in a conviction of murder in the first degree is that the death which resulted was proximately caused by something that was done by defendant. *State v. Cochrane* (1949), 151 Ohio St. 128. Defendants herein have offered the expert evidence of physicians in order to show that the beating deceased received on the night of May 5, 1963, was not the proximate cause of her death. The state has offered evidence similar in nature but to the effect that the defendants' acts were, in fact, the proximate cause of the death. Therefore, in considering the issues in the light most favorable to the defendants, the most that can be said is that there is conflicting expert testimony as to a material element upon which reasonable minds may reach different conclusions.

In addition the records undeniably show that deceased died from a massive pulmonary embolism, that the embolism could form in any person if that person were confined in bed, that deceased would not have been likely to develop the embolism that took her life if she had not been so restricted to bed, and that deceased was so confined as a direct result of the injuries she received on May 5, 1963.

It has not been contended that the trier of facts in each case did not take all this testimony into consideration. In fact

the trial judge in the Bellamy and Miller cases specifically instructed the respective juries on the issue of proximate cause of death. A presumption exists that the three-judge panel in the Swiger case also decided the issue of proximate cause, for to hold otherwise would be to presume judicial error.

In light of the above, the decisions reached by the triers of fact rebut the contention defendants wish to make. "The jury is the sole judge of the weight of the evidence and the credibility of witnesses. It may believe or disbelieve any witness or accept part of what a witness says and reject the rest. In reaching its verdict, the jury should consider the demeanor of the witness and the manner in which he testifies, his connection or relationship with the prosecution or the defendant, and his interest, if any, in the outcome." *State* v. *Antill* (1964), 176 Ohio St. 61, 67. There can be no doubt that this rule applies to the trier of facts, whether it be a judge, a panel of judges or a jury.

In *Hamden Lodge* v. *Ohio Fuel Gas Co.* (1934), 127 Ohio St. 469, this court held in the fourth paragraph of the syllabus:

"Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury."

Paragraph five of the syllabus of the *Antill case, supra*, specifically applying this civil rule to criminal cases, is as follows:

"Where from the evidence reasonable minds can reach different conclusions on the issue of whether the defendant is guilty beyond a reasonable doubt, the case is one for determination by the jury."

In view of the existing conflict of testimony on which reasonable minds can reach different conclusions and the determinations by the triers of fact in all three cases that the defendants were guilty of murder beyond a reasonable doubt, the contention of defendants that the state failed to sustain its burden of proof that the beating of May 5, 1963, was a proximate cause of the death of deceased is without merit.

The second contention of defendants is that the state has not met its burden in proving the purpose or intent required by

Section 2901.01, Revised Code. That section reads, in pertinent part:

"No person shall purposely * * * in perpetrating or attempting to perpetrate rape, arson, robbery or burglary, kill another."

As an abstract proposition, it cannot be denied that intent is an essential element in a conviction for murder. However, "the intent of an accused person dwells in his mind. Not being ascertainable by the exercise of any or all of the senses, it can never be proved by the direct testimony of a third person and it need not be. It must be gathered from the surrounding facts and circumstances under proper instructions from the court." *State* v. *Huffman* (1936), 131 Ohio St. 27, paragraph four of the syllabus.

The requisite intent may be presumed from what is, in fact, done. It may be deduced from the surrounding circumstances. In these cases, the uncontradicted testimony and medical reports showed that deceased received a very severe beating around the head and chest, a beating that rendered a 76-year-old woman practically unrecognizable. A footprint was discernible in the blood on her chest. The severity of this beating belies any contention that it can be attributed to anything other than deliberate acts, and men are presumed by law to intend the reasonable and natural consequences of acts deliberately done. See *State* v. *Farmer* (1951), 156 Ohio St. 214.

It cannot be said that death is not a natural consequence of such a beating as was inflicted herein on a 76-year-old woman. Therefore, this being an issue upon which reasonable minds could differ, the question of intent is one for the trier of facts. The severity of the beating administered is sufficient "other evidence," as required by the *Farmer case, supra*, to warrant a finding by the triers of fact that defendants possessed the requisite intent. That such intent was found is obvious. Defendants' contention that the state failed in its burden of proof in this instance is without merit.

In their third contention, defendants raise serious questions of law with respect to certain recordings mentioned in the statement of facts *supra*. In essence, defendants maintain that

the making of the recordings and their introduction into evidence deprived them of their right to counsel and of their right to confront the witnesses used against them.

There is no evidence in the records to dispute the state's testimony in support of authenticity that the recordings are true and accurate reproductions of conversations between the particular defendants involved in any one of the three conversations and the arresting officers. The records affirmatively show that the recordings specify both the date on which they were made and the location where they were taken. The records show further that the conversations were held very shortly after the arrest of the suspects.

In order to better understand the nature of the problem, the particular recordings introduced at each trial along with the contentions of denial of counsel and of confrontation must be separately analyzed and applied to the facts at hand.

In Swiger's trial, recordings Nos. 1 and 2 were introduced into evidence. The former was referred to as an "interview" between police officers on the one hand and Swiger and Miller on the other. However, upon examination of the records it is apparent that Swiger himself is the sole informant. He freely admits his participation in the events on the night of May 5, 1963, although steadfastly denying that he delivered the beating to deceased. Miller remains silent during the course of the conversation. At its end, Miller's answer to the question of whether Swiger's statements are essentially true is, "yes." This recording reproduces a voluntary confession. As such it is indistinguishable from a written confession and is undeniably admissible into evidence.

Recording No. 2 is, in essence if not in form, identical. Bellamy relates the happenings of the evening up until the time he left Swiger and Miller. Miller explains where he and Swiger sold the property stolen from the premises of deceased. Swiger explains how he spent his share of the loot. This conversation is nothing more than a round-table discussion among three suspects and the arresting officers. It does not contradict Swiger. Further, and most importantly, it cannot seriously be contended that statements of a codefendant can prejudice one who has already admitted his participation in a criminal

act. Corroborating statements, interwoven with statements made by the accused himself, cannot further condemn one who has already freely and voluntarily confessed his own guilt.

The only distinguishing feature between recordings Nos. 1 and 2 is that, in No. 1, Swiger claims that Bellamy delivered the fatal beating, and, in No. 2, Bellamy contends that Swiger delivered the fatal beating. This distinction is irrelevant in light of the statement in Section 1.17, Revised Code, that "any person who aids, abets, or procures another to commit an offense may be prosecuted and punished as if he were the principal offender."

At Bellamy's trial, recordings Nos. 3 and 2 were entered into evidence. The former was introduced without objection, and the record discloses that, upon being asked "to recite the incident that occurred on Sunday evening of May 5," 1963, Bellamy volunteered the information that he was present at the Austing home and fully participated in both the events that took place there and those that preceded the splitting of the loot and his return home. He discloses, also, the use to which he put his share of the money taken. As such, it was a voluntary confession, and no error was committed by its introduction into evidence.

Recording No. 2 was then introduced into evidence in the exact form as in the Swiger trial. As before, Bellamy reiterates the events of the evening in question in substantially the same manner as in recording No. 3. Recording No. 2 differs from recording No. 3 no more in substance than from No. 1 at Swiger's trial, and Section 1.17, Revised Code, *supra*, reduces any factual distinction as to who was solely responsible for administering the beating on deceased to a moot point.

At Miller's trial, recording No. 1 and part of recording No. 2 were introduced into evidence. The former was allowed only after explicit instructions from the court to the jury that the statements by Swiger alone, although made in the presence of Miller, were not to be considered as competent evidence unless the jury found that Miller did in fact ratify them, did accept them as his own, or did concur in their authenticity in some significant manner. The record shows that Miller *was* present at the time Swiger made the statements and *affirma-*

*tively stated that they were essentially correct.* In view of this, he purports to adopt the statements and make them his own. The voluntary confession of an accomplice made in the immediate presence of an accused is admissible as evidence against the accused even though the accomplice and the accused were under arrest, if the accused ratifies the confession or adopts it as his own. Whether there is such an adoption or ratification is a question of fact for the jury to determine after proper instructions from the court. The record shows that such instructions were correctly given and there is no error in the introduction of recording No. 1 into the record.

Only that portion of recording No. 2 which contains Miller's statements was entered into evidence at his trial. As such there can be no serious objection as to this for it merely complements recording No. 1. It is at most cumulative for it adds little or nothing to the testimony ratified by Miller in recording No. 1 and is merely his freely given account of part of the entire episode following and including the night of May 5, 1963.

At no time during any of the proceedings did any of the defendants deny that the admissions used against them had actually been made as represented by the recordings. At no time during any of the proceedings did any of the defendants deny that the admissions used against them had been made voluntarily. The records indisputably support the view that the confessions involved were in fact made voluntarily under circumstances which did not create any feeling that the defendants were compelled to answer on pain of suffering physical or psychological mistreatment. Nothing in the records suggests any threat or promise of leniency. None of the defendants were in bad health or were suffering from a mental derangement. There was no incommunicado detention, extended interrogation or unnecessary delay in arraignment. The circumstances of these cases disclose a routine inquiry following closely upon the heals of a legal detention. The officers involved were under a duty to ascertain the facts. It is accepted police practice throughout the country to fairly and noncoercively question a suspect.

"In *Gideon* v. *Wainwright*, 372 U. S. 335 [the Supreme Court of the United States] * * * held that every person ac-

cused of a crime, whether state or federal, is entitled to a lawyer at trial." *Escobedo* v. *Illinois* (1964), 378 U. S. 478, 487.

Ohio has long recognized the right of an accused to be represented by counsel, that he must be informed of this right, and that if indigent he must be assigned counsel. See *Conlan* v. *Haskins, Supt.* (1964), 177 Ohio St. 65, certiorari denied, 381 U. S. 940. The *Escobedo* decision which appears to extend *Gideon* is, in fact, expressly limited by the Supreme Court to those situations where "*the suspect has requested and been denied an opportunity to consult with his lawyer * * *.*" (Emphasis added.) *Escobedo, supra,* at 491. In that case, Escobedo had made frequent requests to converse with his attorney, who was present right outside the interrogation room and was denied that right until after he had made an incriminating statement. In sharp contrast to that, defendants herein freely and voluntarily confessed to their participation in the drama that took place at the Austing residence on the night of May 5, 1963. In fact, defendants do not even contend that their recorded confessions were made involuntarily. As shown by the records, the fear of "compulsory self-disclosure," wisely promulgated by Dean Wigmore and quoted in *Escobedo, supra,* at 489, simply does not apply in these cases.

Where skillful police investigation indicates that a person or group of persons may be guilty of a crime and that person or group of persons freely disclose their participation in that crime to the arresting officers soon after arrest, such person or group of persons cannot later complain that he or they have been deprived of their constitutional right to counsel, where he or they were represented by counsel before arraignment as provided by the Ohio Revised Code. To say otherwise would, in fact, destroy the fruits of a skillful investigation and arrest without conferring any benefit on society. To hold that the contentions of the defendants are correct would in fact negate the possibility of obtaining a voluntary confession from anyone suspected of committing an offense.

In respect to any contention that defendants were not apprised as to their constitutional rights, the records speak for themselves. While admittedly the records do not specify as to

what particular constitutional rights defendants were informed of, Lieutenant Vogel of the Hamilton County sheriff's office expressly stated, "yes, we certainly did," in answer to the query as to whether information as to constitutional rights was explained *before* the interviews with defendants were conducted. The records must be considered in light of the fact that the Constitution and statutes of Ohio both require that counsel be provided for an indigent defendant and afford the suspect the right not to incriminate himself. The fact that the record is general rather than specific in this respect does not give rise to a presumption that the duties imposed by the Constitution and statutes of Ohio were not complied with. In addition, there is no assertion in the record by any of the parties thereto that the Constitution and statutes of Ohio were not complied with. In view of this and the circumstances surrounding these cases, there is nothing in the Fifth Amendment that requires exclusion of the recordings admitted into evidence in these cases. Similarly, there is nothing in the Ohio Constitution requiring exclusion. The contention of defendants is without merit.

While none of the defendants herein attempted to call their co-conspirators for cross-examination at trial, each now contends that the use of the recordings by the state was a denial of confrontation.

Section 10, Article I of the Constitution of Ohio, provides in part:

"In any trial, in any court, the party accused shall be allowed * * * to meet the witnesses face to face."

This fundamental right is expressly preserved and "made obligatory on the states by the Fourteenth Amendment." *Pointer* v. *Texas* (1965), 13 L. Ed. 2d 923.

Both this court and the Supreme Court of the United States have construed this constitutional guarantee on many occasions. The following examples are typical:

"The purpose of the constitutional provision according an accused the right to confront his accusers and the witnesses used against him is to provide the accused an opportunity for cross-examination. * * *" *Henderson* v. *Maxwell, Warden* (1964), 176 Ohio St. 187, 188.

"Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examination; *an adequate opportunity for cross-examination may satisfy the clause even in the absence of physical confrontation.*" (Emphasis added.) *Douglas* v. *Alabama* (1965), 13 L. Ed. 2d 934, 937.

In the instant cases, it is difficult to perceive any denial of confrontation. The first recording introduced into evidence at the trials of Swiger and of Bellamy (Nos. 1 and 3, respectively, the latter without objection) was a voluntary confession, nothing more and nothing less. As such there can be no question raised as to confrontation. The second recording introduced at their trials (No. 2 in each instance) is a round-table discussion among all three defendants in which each participated. Not only was a full and adequate physical confrontation accorded the defendants, but all three substantially corroborated the narration each provided. None of the accused denied their participation in the events at the Austing home. None of the accused took issue with the statements of another. The absolute lack of legally conflicting testimony refutes any later claim to denial of confrontation or of cross-examination.

Recording No. 1 was introduced at Miller's trial. In it are statements by Swiger that the jury was instructed to ignore unless it found that Miller adopted or ratified them. Therefore, the jury must have decided that the testimony was irrelevant or that there was an adoption. In either case no problem of confrontation arises.

Recording No. 2 was introduced to the extent of Miller's freely given testimony only. Thus, there was again no denial of confrontation or of cross-examination.

Defendants' contention on this topic is without merit, for a physical confrontation is indisputable and an adequate opportunity for cross-examination was clearly existent. The fact that the defendants chose to add to and clarify each other's statements rather than cross-examine and detract from them only makes the evidence more reliable and presents a clearer picture of events of May 5, 1963, as they must have transpired.

Defendant Miller argues that the trial court erred in overruling a motion to change venue on the ground of copious ad-

verse publicity. Section 2931.29, Revised Code, provides, in part: "If it appears to the Court of Common Pleas, by affidavit or evidence in open court, that a fair and impartial trial cannot be had in the county where a cause is pending, such court shall order the accused tried in another county." This statute has been uniformly interpreted to invest the trial court with discretion as to whether a change of venue is necessary to insure a fair and impartial trial. Further, it has long been the rule in Ohio that "the examination of jurors on their *voir dire* affords the best test as to whether or not prejudice exists in the community against the defendant; and where it appears that the opinions as to the guilt of the defendant of those called for examination for jurors are * * * not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue." *Townsend* v. *State* (1912), 17 C. C. (N. S.) 380, 25 C. D. 408, affirmed without written opinion, 88 Ohio St. 584 (1913).

The record affirmatively shows that the trial court followed the above test, and, in absence of a clear showing of an abuse of discretion, its ruling must stand. Defendant Miller's contention is, thus, without merit.

Defendant Swiger contends that prejudicial error was committed when the prosecutor accused him of raping deceased. However, the record is clear that there were grounds for such a question, and that a timely objection was made and was sustained by the three-judge panel. In light of this, even if the question constituted error, which it did not, it would not be prejudicial. This contention is, therefore, without merit.

Defendants Swiger and Bellamy contend that it was error for the state to use expert medical testimony in rebuttal. However, they overlook the fact that the testimony complained of was used solely to rebut evidence first brought forth by defendants on direct examination of physicians testifying for the defense. Hence, no error was committed. This is particularly true of defendant Swiger whose counsel cross-examined the rebuttal witness before resorting to an objection. It is elementary that a party may not be heard to object after vainly attempting to discredit a witness. This contention is likewise without merit.

In conclusion, we believe that where there is sufficient evi-

dence for a case to go to the jury, there is sufficient evidence for the jury to convict; and the test of whether the evidence is sufficient is whether reasonable minds can reach different conclusions on the issue of whether the defendant is guilty beyond a reasonable doubt. Specifically applying this to the three cases at hand, after a thorough review of the records, we find that there is sufficient evidence as to the material elements of the crime (*i. e.*, whether the acts of the defendants were the proximate cause of death and whether the requisite intent to kill existed) from which reasonable minds could reach different conclusions.

*Judgments affirmed.*

TAFT, C. J., ZIMMERMAN, O'NEILL, HERBERT and BROWN, JJ., concur.

SHERER, J., dissents.

SHERER, J., of the Second Appellate District, sitting for SCHNEIDER, J.